**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **WILLIAM FRAKES, JR.,** ) | |
| As Successor in Interest and Special ) | |
| Representative of William L. Frakes, ) | |
| deceased, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **Case No. 3:23-CV-2963-MAB** |
| ) | |
| **JUSTIN WARREN,** ) | |
| **JORDAN HECKLER,** ) | |
| **JOSEPH R. LAGESSE, and** ) | |
| **JOHN DOE CORRECTIONAL** ) | |
| **OFFICERS,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motion for judgment on the pleadings and the motion for summary judgment on the issue of exhaustion, both of which were filed by Defendants Justin Warren and Jordan Heckler (Docs. 70, 71). For the reasons explained below, both motions are denied.[1]

---

[1] The undersigned has authority to rule on these motions even though the John Doe Correctional Officers have not appeared and consented to magistrate judge jurisdiction because they are "unnamed and unknown," which "indicates that they [are] not 'parties' whose consent § 636(c) requires." *Swisher v. Porter Cnty. Sheriff's Dep't*, 761 F. App'x 616, 619–20 (7th Cir. 2019) (citing *Williams v. King*, 875 F.3d 500, 502–04 (9th Cir. 2017) (holding that "parties" under § 636(c) means *named* parties, whether served or unserved)). *Cf. Coleman v. Labor & Indus. Review Comm'n,* 860 F.3d 461, 474 (7th Cir. 2017) (recognizing that unnamed class members are not parties to a class-action case and thus a magistrate judge may rule without their consent).

## BACKGROUND

William Frakes filed this *pro se* civil action pursuant to 42 U.S.C. § 1983 on August 30, 2023, while he was still an inmate of the Illinois Department of Corrections, for alleged deprivations of his constitutional rights at Robinson Correctional Center (*see* Doc. 1). Following the threshold review of his complaint, Mr. Frakes was permitted to proceed on an Eighth Amendment claim against correctional officers Justin Warren and Jordan Heckler for failing to protect him from a fellow inmate, who brutally attacked Frakes while he was sleeping in the early morning hours of May 21, 2023, leaving Frakes with second and third-degree burns, knocking out six of his teeth, and causing injuries that required over eighty staples and stitches (Doc. 10).

Mr. Frakes was released from prison in January 2024 (Doc. 71-1), but died the following month (*see* Doc. 28, p. 1). Months later, Frakes's son, William Frakes, Jr., was appointed Special Representative for his deceased father and was substituted in as the Plaintiff in this matter (Doc. 51).[2] Plaintiff, through retained counsel, filed a three-count Amended Complaint (Doc. 57). He maintained the Eighth Amendment failure to protect claim against Defendants Heckler and Warren and added an unspecified number of John Doe Officers as Defendants to that claim (*Id.*). Plaintiff also asserted a new state law negligence claim against Defendants Heckler, Warren, and the John Doe Officers (*Id.*). And finally, Plaintiff added Joseph LaGesse, the inmate who purportedly attacked Mr.

---

[2] To avoid confusion, the deceased original Plaintiff—William Frakes—will be referred to as Mr. Frakes, while his son, the current Plaintiff in this matter—William Frakes, Jr.—will be referred to as Plaintiff.

Frakes, as a Defendant and asserted a battery claim against him (*Id.*). All claims are brought pursuant to the Illinois Survival Act, 755 ILCS 5/27-6 (*Id.*).

Defendants Heckler and Jordan filed a motion for judgment on the pleadings, arguing that Plaintiff's negligence claim (Count 2) should be dismissed because it is barred by sovereign immunity under the Illinois State Lawsuit Immunity Act, 705 Ill. Comp. Stat. 505/8, and the common law doctrine of public official immunity (Doc. 70). Defendants Heckler and Jordan also filed a motion for summary judgment on the issue of exhaustion, arguing that Mr. Frakes failed to exhaust his administrative remedies before commencing this suit (Doc. 71). Plaintiff filed responses in opposition to both motions (Docs. 76, 77). No reply briefs were filed.

## MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants Heckler and Warren argue that Count 2, Plaintiff's state law negligence claim, must be dismissed because it is barred by sovereign immunity under the Illinois State Lawsuit Immunity Act, 705 Ill. Comp. Stat. 505/8, and the common law doctrine of public official immunity (Doc. 70).

A Rule 12(c) motion for judgment on the pleadings is governed by the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 312 (7th Cir. 2020) ("The only difference between a motion for judgment on the pleadings and a motion to dismiss is timing; the standard is the same."). As with a motion to dismiss, the court is confined to the matters presented in the pleadings and must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Unite Here*

*Loc. 1 v. Hyatt Corp.*, 862 F.3d 588, 595 (7th Cir. 2017); *Brown v. Dart*, 876 F.3d 939, 940 (7th Cir. 2017). Judgment on the pleadings is appropriate only "when there are no disputed issues of material fact and it is clear that the moving party . . . is entitled to judgment as a matter of law." *Unite Here*, 862 F.3d at 595 (citing *Nat'l Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987)).

### A. Sovereign Immunity

The Illinois State Lawsuit Immunity Act provides that the State of Illinois is immune from suit in federal court for state law claims; rather, the Illinois Court of Claims has exclusive jurisdiction over state law tort claims against the state. *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001) (citing 745 Ill. Comp. Stat. 5/1). State sovereign immunity extends to claims against state employees, even when they are sued in their individual capacities, when the action is "nominally one against the servants or agents of the State" but "the real claim is against the State of Illinois itself and . . . the State of Illinois is the party vitally interested." *Murphy v. Smith*, 844 F.3d 653, 656 (7th Cir. 2016).

However, as Defendants acknowledged in their brief (Doc. 70, p. 3), there is an important exception to state sovereign immunity in suits against state officials or employees: the doctrine "does not apply to state-law claims against a state official or employee who has violated statutory or constitutional law. *Murphy*, 844 F.3d at 655 (citing *Leetaru v. Board of Trustees of University of Illinois*, 32 N.E.3d 583 (Ill. 2015)). "This exception is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not." *Murphy*, 844 F.3d at 659 (citation omitted).

Here, Defendants argue that state sovereign immunity bars Plaintiff's negligence claim because:

> Plaintiff cannot show that either Defendants [sic] violated statutory or constitutional [law] by the alleged negligence at issue. . . . While Plaintiff's constitutional claim of failure to protect is still pending, there is nothing that moves this state negligence claim to a claim that falls outside of the protection of the state-law sovereign immunity.

(Doc. 70, p. 3).

The Court is not persuaded by Defendants' argument. Of course, Plaintiff cannot yet show Defendants' conduct violated statutory or constitutional law—this matter is still in the pleadings stage, discovery has not taken place, and Plaintiff has not had to prove anything yet. Given the stage of the proceedings, the question for the Court is actually whether Plaintiff has alleged facts that, when accepted as true, are sufficient to bring his negligence claim within the exception to sovereign immunity for constitutional violations. *See Murphy*, 844 F.3d at 658–59 (quoting *Healy v. Vaupel*, 549 N.E.2d 1240, 1247 (Ill. 1990) ("If the plaintiff *alleges* that state officials or employees violated statutory or constitutional law, [s]overeign immunity affords no protection.")) (internal quotations marks omitted; emphasis added); *Smith v. Jones,* 497 N.E.2d 738, 740 (Ill. 1986) ("An action against a State official for conduct in his official capacity will withstand a motion to dismiss the complaint on sovereign immunity grounds if the complaint alleges that the official is enforcing an unconstitutional law or violating a law of Illinois and thus acting beyond his authority."). *See also Turpin v. Koropchak,* 567 F.3d 880, 884 (7th Cir. 2009) (holding exception to state sovereign immunity could not save plaintiff's claim from

dismissal because "[n]othing in [plaintiff's] complaint alleges a violation of the State constitution or a statute").

Here, Plaintiff alleged that Defendants' conduct underlying the negligence claim also violated the Eighth Amendment (*see* Doc. 57). That is sufficient to defeat Defendants' motion for judgment on the pleadings based on sovereign immunity. *See Whitlock v. Brueggemann*, 682 F.3d 567, 590 (7th Cir. 2012) (holding Illinois State Police "cannot use the doctrine of sovereign immunity to avoid facing suit on Whitlock's state law claims" because Whitlock had alleged that the defendants violated his constitutional rights).

## B. Public Official Immunity

Public official immunity is a common law defense to liability for employees of the State of Illinois for the negligent but good faith performance of *discretionary* duties. *Mich. Ave. Nat'l Bank v. Cnty. of Cook,* 732 N.E.2d 528, 544 (Ill. 2000); *Currie v. Lao*, 592 N.E.2d 977, 984 (Ill. 1992); *Kinzer v. City of Chi.*, 539 N.E.2d 1216, 1220 (Ill. 1989). Officials are not immune, however, from negligence in performing *ministerial* functions. *See Mich. Ave.*, 732 N.E.2d at 544 ("[P]ublic official immunity attaches only to conduct by a state official that is discretionary, rather than ministerial, in nature.").

The common law defined discretionary acts as "those which are unique to a particular public office," *Snyder v. Curran Twp.*, 657 N.E.2d 988, 993 (Ill. 1995), and require the employee to exercise "personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act should be performed." *Andrews v. Metro. Water Reclamation Dist. of Greater Chicago*, 160 N.E.3d 895, 905 (Ill. 2019) (citation omitted). *See also Greeson v. Mackinaw Twp.*, 565 N.E.2d 695, 699 (Ill. App. Ct.

1990) (discretionary acts "require[e] personal deliberation, decision, and judgment.") (citing Prosser, Torts § 132, at 988–89 (4th ed.1971)). In contrast, a ministerial act is one "amounting to obedience of orders or the performance of a task in which the officer had no choice of his own." *Greeson*, 565 N.E.2d at 699 (citing Prosser, Torts § 132, at 988–89 (4th ed.1971)). *See also Snyder*, 657 N.E.2d at 993 ("ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act.") It has long been recognized, however, "that the distinction between discretionary and ministerial functions resists precise formulation," *Snyder*, 657 N.E.2d at 992, and the determination must "be made on a case-by-case basis in light of the particular facts and circumstances." *Monson v. City of Danville*, 115 N.E.3d 81, 91 (Ill. 2018) (citing *Snyder*, 657 N.E.2d at 992).

Additionally, even when the acts at issue are discretionary, public officials' immunity "does not extend to acts based on corrupt or malicious motives or willful and wanton acts." *McKay v. Kusper*, 624 N.E.2d 1140,1148 (Ill. App. Ct.1993) (citation and internal quotation marks omitted). Willful and wanton conduct in Illinois can be pleaded by alleging the basic elements of a negligence claim—duty, breach, and causation—as well as "either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *E.g., Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012). *Accord McKay*, 624 N.E.2d at 1148 ("To plead a cause of action for willful and wanton misconduct, a complaint must allege facts demonstrating that a defendant

committed acts with actual or deliberate intention to harm or with an utter indifference or conscious disregard for the safety of others.")

Here, the Court finds that Defendants' argument does not justify dismissal of Plaintiff's negligence claim. Plaintiff alleged that Defendants acted not only negligently but with deliberate indifference to the safety of Plaintiff (and other inmates), when they violated established prison rules and policies by not effectively separating Frakes and Lagesse after they had an altercation, allowing Lagesse to run a black-market commissary operation, and/or allowing Lagesse to possess a hot pot that had been turned into a boiler (Doc. 57, para. 8, 10, 11, 16, 17, 19, 24). Defendants say those decisions were "discretionary acts and judgment calls" (Doc. 70, p. 4), while Plaintiff says they were ministerial (Doc. 77, p. 4). The complaint does not contain enough facts for the Court to definitively say one way or the other. Furthermore, Plaintiff alleged Defendants acted in a willful and wanton manner, (Doc. 57, para. 24, 25), and the Court finds that Plaintiff has supported that assertion with facts from which it can be inferred that Defendants acted with utter indifference or conscious disregard for the safety of others (*see* Doc. 57, para, 1–19). Accordingly, Defendants are not entitled to judgment on the pleadings on their argument regarding public officials' immunity.

## MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF EXHAUSTION

Defendants contend that because Mr. Frakes filed this lawsuit while he was a prisoner, the exhaustion requirement of the Prison Litigation Reform Act ("PLRA") still applies even though he later died, his son is now the Plaintiff, and an amended complaint was filed (*Id.* at pp. 5–6). Defendants further argue that the evidence shows the grievance

process was available to Mr. Frakes, but he failed to fully exhaust his administrative remedies because he filed suit prior to receiving a decision from the ARB (*Id.* at pp. 7–8).

Plaintiff filed a response in opposition, arguing that the PLRA's exhaustion requirement does *not* apply because he is and was not a prisoner subject to the dictates of the PLRA and, furthermore, this matter is proceeding on the amended complaint, which "effectively constitutes a new action for purposes of the PLRA" (Doc. 76). Plaintiff's response did not address Defendants' assertion that Mr. Frakes failed to fully exhaust his administrative remedies (*see id.*).

The Court notes as an initial matter that if William Frakes had waited a few months to file suit until after he was released from prison in January 2024, there is no question that Prison Litigation Reform Act's exhaustion requirement would not apply. *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998). Similarly, after William Frakes, Jr. was substituted in as the plaintiff in this case in July 2024 (Doc. 51), had he opted to voluntarily dismiss this case and file a new suit asserting the same claims (as the two-year statute of limitations had not yet elapsed), Defendants would have had no basis for asserting exhaustion as an affirmative defense. *See Johnson v. Daley*, 339 F.3d 582 (7th Cir. 2003) (stating that the Supreme Court has repeatedly "interpreted and enforced the PLRA's rule, 42 U.S.C. § 1997e(a), that prisoners (and only prisoners) must exhaust administrative remedies before filing suit under Section 1983") (alteration in original). However, for the sake of efficiency, economy, and convenience, Plaintiff filed an amended complaint. And Defendants Heckler and Warren responded by filing a motion for summary judgment on

Page 9 of 24

the issue of exhaustion (Doc. 71). So now the Court is left with the question of whether

the exhaustion requirement applies in this particular instance.

There is case law from other district courts, none of which is binding on this court,

holding that the PLRA's exhaustion requirement still applied even after the original

plaintiff passed away during the litigation and a non-prisoner party was substituted in

his place as the plaintiff. *Sultaana v. McConahay*, No. 1:23-CV-01791, 2025 WL 2780618, at

*12 (N.D. Ohio Sept. 30, 2025); *Jackson v. Hall*, No. CV 1:20-3036-DCC-SVH, 2021 WL

6843284, at *6–7 (D.S.C. Aug. 2, 2021), *report and recommendation adopted*, No. 1:20-CV-

03036-DCC, 2022 WL 92615 (D.S.C. Jan. 10, 2022); *Tretter v. Pennsylvania Department of

Corrections*, No. 3:11-cv-00423, 2012 WL 360029, at *4 (M.D. Pa. Feb. 2, 2012). And yet there

are sound policy reasons as to why the PLRA's exhaustion requirement should not apply

to Plaintiff William Frakes, Jr. (*see* Doc. 76). The Court, however, declines to definitively

answer the question because, even if the Court assumes that exhaustion *does apply*,

Defendants have failed to carry their burden of proof to demonstrate that they are entitled

to judgment as a matter of law on the affirmative defense of exhaustion.

### Facts

Plaintiff did not respond to Defendants' statement of undisputed facts (*see* Doc.

76). Those facts are therefore deemed admitted for purposes of summary judgment so

long as they are properly supported by evidence in the record. *See* SDIL-LR 56.1(g); Fed.

R. Civ. P. 56(e)(2); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (citations

omitted). Because Defendants' facts were very bare-bones (*see* Doc. 71, pp. 2–3). The Court

will also consider supplemental facts that are contained in the record and are not subject

to any reasonable dispute in order to provide a more complete picture of Frakes's use of the grievance process.

It is alleged that Defendant Joseph Lagesse attacked Mr. Frakes in the early morning hours of May 21, 2023 (Doc. 57, para. 8). Frakes submitted an emergency grievance dated June 28, 2023 (Doc. 71-4, pp. 3–4). The Court notes that it was "collected" five days later on July 3rd and sent to the Clinical Services office, where it was assigned number 23-0994E (Doc. 71-2, p. 7; *see* Doc. 71-4, p. 3). Clinical Services then forwarded the grievance to the warden on July 5th, (Doc. 71-2, p. 7), who decided it was in fact an emergency (*see* Doc. 71-4, p. 3; *see also* Doc. 71-3, p. 61).

Also on July 5th, Frakes filed another emergency grievance (Doc. 71-4, pp. 5–6), which is substantially the same as the June 28th grievance. The Court notes that it was collected on July 6th and sent to Clinical Services, who then forwarded it to the counselor that same day (*see id*; Doc. 71-2, p. 7). The resubmitted grievance was also numbered 23-0994E and "aggregated," which apparently means it was combined with Frakes's June 28th grievance (*see* Doc. 71-4, pp. 5–6). The Court notes that the aggregated grievances were received by Grievance Officer, Miramony Chenault, on July 6, 2023 (*see id.* at p. 1; Doc. 71-2, p. 7).

On July 15th, Frakes resubmitted the July 5th grievance and marked it as an emergency (*see* Doc. 71-3, pp. 6–7). Frakes wrote that he had asked about the status of the July 5th grievance and a counselor told him that it "must of been lost" so he was resubmitting it (*Id.*). The Court notes that the resubmitted grievance was collected and sent to Clinical Services on July 18th, where it was numbered 23-1113 (Doc. 71-2, p. 6).

Although Frakes had marked it as an emergency (*see* Doc. 71-3, p. 6), it was not sent to the warden to determine whether it should be processed on an expedited basis (*see id.*; Doc. 71-2, p. 6). It was instead forwarded to the counselor, who received it on July 18th (Doc. 71-2, p. 6; Doc. 71-3, p. 6). The counselor responded on July 19th, and the Court notes that the response was forwarded to Frakes that same day (Doc. 71-2, p. 6; Doc. 71-3, p. 6). The Court further notes that Frakes submitted the grievance for second level review, and on July 21st, it was collected, forwarded to Clinical Services, then passed on to and received by Grievance Officer Chenault (Doc. 71-2, p. 6; *see* Doc. 71-3, p. 5).

Chenault was now in possession of two grievances from Frakes: the original aggregated grievance #23-0994E and the resubmission #23-1113. Chenault responded to the aggregated grievance #23-0994E on July 28, 2023 (Doc. 71-4, p. 1). She indicated that an Internal Affairs officer told her the "investigation is still in progress" and she recommended that the grievance be denied" because "[t]here is no evidence to support allegations of staff misconduct" (*Id.*). The warden did not receive Chenault's recommendation until almost two weeks later on August 9, 2023 (*see id.*). That same day, the warden concurred with the recommendation and denied the grievance (*Id.*). The Court notes that, according to the Cumulative Counseling Summary, the warden's decision was "forwarded to [Frakes] for appeal consideration" on August 10, 2023 (Doc. 71-2, p. 5).

Chenault then responded to the resubmitted grievance #23-1113 on August 14, 2023 (Doc. 71-3, p. 5). She once again wrote that Internal Affairs said the incident was still under investigation and therefore recommended the grievance be denied (*Id.*). The

Page 12 of 24

warden received the grievance the following day and concurred (*Id.*). The Court notes that, according to the Cumulative Counseling Summary, the warden's decision was forwarded to Frakes on August 16, 2023 (Doc. 71-2, p. 4).

Frakes appealed the denial of both grievances to the ARB, although it is unclear when exactly he put his appeals in the mail (*see* Docs. 71-2, 71-3, 71-4). The ARB received Frakes's appeal of the resubmitted grievance #23-1113 on September 27, 2023 (*see* Doc. 71-3, pp. 1, 3). Even though that was 43 days after the warden's decision, the ARB did not immediately reject the appeal as untimely (*see* Doc. 71-3). The ARB finally reviewed it on February 26, 2024, noted that Frakes had been released from custody a month prior and therefore sent the appeal "to file" without issuing a decision (Doc. 72, para. 9; Doc. 71-3, p. 2). a

As for the appeal of the aggregated grievance #23-0994E, the ARB received it on November 1, 2023, nearly three months after the warden's decision (*see id.* pp. 1, 59, 60). A week later, on November 8, 2023, the ARB returned the aggregated grievance to Plaintiff without review because it was received more than 30 days after the date of the warden's decision (*Id.* at p. 59).

Meanwhile, Frakes had already filed his complaint, initiating this lawsuit on August 30, 2023 (Doc. 1).

The Court notes that, according to the ARB's records, Frakes had six other appeals that were deemed untimely because they were received by the ARB more than 30 days after the warden's decisions (*see* Doc. 71-3, pp. 17–20, 29–32, 41–43, 46–55). All of those appeals were from grievances that Frakes submitted during the summer of 2023 (June,

July, or August) and were decided by Warden William Loy in August or September 2023 (*see* Doc. 71-3, pp. 17–20, 29–32, 41–43, 46–55). But then sometime in or around the middle of October 2023, a new warden, Chad Jennings, began deciding the grievances (*see* Doc. 71-3, pp. 13–16, 21–24, 25–28, 33–36, 37–40). Every one of Frakes's appeals of Warden Jennings' decision was received by the ARB within the required 30-day window (*see id.*).

## Legal Standard

Summary judgment is proper if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court's task is to view the record, and draw all reasonable inferences, in the light most favorable to the non-moving party and decide if there is a genuine material dispute of fact. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). Even when "a nonmovant fails to respond to a motion for summary judgment, the movant 'still ha[s] to show that summary judgment was proper given the undisputed facts,' with those facts taken as usual in the light most favorable to the nonmovant." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011)).

## Discussion

### A.  The Exhaustion Requirement

The Prison Litigation Reform Act provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). In order for a prisoner to properly exhaust his or her administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The Seventh Circuit requires strict compliance with the exhaustion requirement. *E.g., Smallwood v. Williams*, 59 F.4th 306, 313 (7th Cir. 2023). "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Pozo*, 286 F.3d at 1024.

Despite the strict exhaustion requirements, the PLRA "does not demand the impossible," and a prisoner need not exhaust remedies that are "genuinely unavailable or nonexistent." *Smallwood*, 59 F.4th at 313 (citation omitted). An "available" grievance procedure means "'capable of use' to obtain 'some relief for the action complained of.'" *Wallace v. Baldwin*, 55 F.4th 535, 542 (7th Cir. 2022) (quoting *Ross v. Blake*, 578 U.S. 632, 642 (2016)). Administrative remedies become "unavailable" when prison officials, for example, altogether fail to respond to a properly filed grievance, fail to respond in a timely fashion, or otherwise use affirmative misconduct to thwart a prisoner from exhausting. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016); *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir. 2002).

Page 15 of 24

Administrative remedies are additionally unavailable "when (despite what regulations or guidance materials may promise) [the process] operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Wallace,* 555 F.4th at 542 (quoting *Ross*, 578 U.S. at 643). "In such cases, the prisoner is considered to have exhausted his administrative remedies." *Pyles*, 829 F.3d at 864 (citation omitted).

Because exhaustion is an affirmative defense, "the burden of proof is on the defendants to establish that administrative remedies were not exhausted, and not on the prisoner to show that administrative remedies were unavailable." *Smallwood*, 59 F.4th at 315 (citations omitted).

## B. The IDOC's Grievance Procedure

As an inmate in the IDOC, Mr. Frakes was required to follow the grievance process outlined in the Illinois Administrative Code to exhaust his claims. 20 ILL. ADMIN. CODE § 504.800, *et seq*. (2017). The standard grievance process requires the inmate to first submit their grievance to their counselor and then to the grievance officer to issue a recommendation to the warden, who then provides the inmate with a written decision on the grievance. *Id.* at §§ 504.810(a), 504.830(e). If, however, the inmate designates the grievance as an emergency, it is submitted directly to the warden. *Id.* at § 504.840. If the warden finds that an emergency exists, then the grievance will be handled on an expedited basis by the grievance officer; the grievance bypasses the counselor entirely. *Id.* On the other hand, if the warden determines that the grievance should not be handled

on an emergency basis, the inmate is notified and must resubmit the grievance through the standard grievance process. *Id.*

Regardless of whether the grievance was processed in the normal manner or as an emergency, if the inmate is unsatisfied with the warden's decision, he or she can appeal to the Administrative Review Board ("ARB"). 20 ILL. ADMIN. CODE § 504.850(a). The ARB must receive the appeal within 30 days of the warden's decision. *Id.* The ARB submits a written report of its findings and recommendations to the Director of the IDOC, who then makes a final decision. *Id.* at § 504.850(d), (e).

### C.  Mr. Frakes's Use of the Grievance Procedure

Defendants note that Mr. Frakes filed the original complaint in this matter on August 30, 2023, which was before the ARB ever received his appeals for the aggregated or resubmitted grievances, let alone responded to them (Doc. 71, p. 8). Defendants argue that Frakes knew about the grievance process, that it was available to him, and that he was "saavy" at utilizing it (Doc. 71, pp. 7, 8). They further intimate that, in this instance, Frakes simply chose not to follow the grievance process and filed suit before he had fully exhausted his administrative remedies (*Id.*). The Court is unpersuaded.

As an initial matter, the Court has serious concerns as to whether the grievance process was truly available or whether it operated as a dead end with officials unwilling or unable to provide any relief. *See Wallace,* 555 F.4th at 542 (explaining courts should resolve any "dead end" argument before proceeding to the merits of the exhaustion dispute). Mr. Frakes was required to file a grievance within 60 days of the attack, *see* 20 ILL. ADMIN. CODE § 504.810(a), which he did (despite his significant injuries and extended

hospitalization). In fact, his resubmitted grievance #23-1113, dated July 15, 2023, was filed within a week of the 60-day deadline. Mr. Frakes's grievances, however, were summarily denied without any consideration of their merit because the investigation into the incident was not complete. Moreover, Mr. Frakes was not provided with any information about the timeline of the investigation and when it might conclude. Nor was he told if he would even be notified when the investigation concluded, or if he had any other avenue for recourse. The prison, in essence, refused to hear his claim. A judge in this district concluded under similar circumstances that the grievance process was a dead end and therefore exhaustion was not required. *Johnson v. Sadler*, No. 24-CV-1385-DWD, 2025 WL 3753970, at *6–7 (S.D. Ill. Dec. 29, 2025). The Court finds the same conclusion to be true here: the grievance process was a dead end for Mr. Frakes.

In the alternative, if the Court assumes that the grievance process was not a dead end, the Court finds that, after reviewing Defendants' evidence in a light most favorable to Frakes, there are a number of unanswered questions and several material issues of fact that preclude the entry of summary judgment for Defendants. The Court begins with Defendants' assertion that Frakes was "very savvy" at utilizing the grievance process. If Frakes was as savvy as Defendants claim, then it simply does not make sense as to why he would rush to file suit before an appeal to the ARB played out. A truly savvy inmate would know that he had nothing to gain and everything to lose by filing suit before fully exhausting his grievances. *See, e.g., Chambers v. Sood*, 956 F.3d 979, 981 (7th Cir. 2020) ("By its plain terms, the PLRA requires prisoners to exhaust administrative

remedies *before* filing suit; a 'sue first, exhaust later' approach is not acceptable.")
(emphasis in original; citation omitted); *Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532, 535
(7th Cir. 1999) ("[A] suit filed by a prisoner before administrative remedies have been
exhausted must be dismissed . . . ."). Under the circumstances here, it would be
particularly senseless for Frakes to file suit in the middle of the exhaustion process
when—as previously stated—all he had to do was wait a few more months until he was
released from prison to file his complaint and then the PLRA's exhaustion requirement
would not have applied to him at all.

So why did Mr. Frakes file his complaint when he did? Defendants want the Court
to accept at face value that Frakes filed suit prematurely, but the Court must still take a
careful and critical look at the evidence (*see* Doc. 71). Moreover, at summary judgment,
the Court is required to view the evidence in a light most favorable to Frakes and to draw
all reasonable inferences in his favor. *Keeton*, 667 F.3d at 884. When the Court does so, the
evidence suggests there may be many other reasons for the timing of Frakes's complaint
aside from an unwise or impulsive rush to file.

First, there is evidence that perhaps Mr. Frakes did not know the grievance process
as well as Defendants say he did. Every one of Frakes's grievances from June, July, and
August 2023 that he appealed was received by the ARB more than 30 days after the
warden's decision. Eight appeals in total. And then a switch flipped, and all of Frakes's
subsequent appeals were received on time. The total about-face is striking, and it leaves
the Court wondering if Frakes was initially unaware of the 30-day deadline for
submitting an appeal to the ARB but later learned about it. "Prisons must affirmatively

Page 19 of 24

provide the information needed to file a grievance." *Ramirez v. Young,* 906 F.3d 530, 538 (7th Cir. 2018). And "[b]efore dismissing a prisoner's complaint for failure to exhaust, the district court should be able to point to evidence that the relevant administrative procedures were explained in terms intelligible to lay persons." *Id.* at 535 (citation and internal quotation marks omitted). Here, however, Defendants did present any facts showing that officials at Robinson Correctional Center had provided information to Frakes about each and every step of the grievance process and the relevant deadlines (*see* Doc. 71).

On the other hand, if Mr. Frakes knew that he had to appeal to the ARB within 30 days, then why didn't he do so for the grievances at issue? Defendants' argument assumes that whatever the reason was, it was attributable solely to Frakes (*see* Doc. 71). Specifically, Defendants appear to assume that Frakes promptly received the warden's decisions and then opted to file suit without first letting the appeals play out (*see* Doc. 71). Defendants did not, however, present any undisputed facts to support this timeline. While the Cumulative Counseling Summary indicates that Clinical Services "forwarded" the warden's decisions to Frakes the same day (or the day after) the decisions were made (*see* Doc. 71-2, pp. 4, 5), that says nothing about when Frakes actually received the decisions. There is no evidence as to when Frakes had the wardens' decisions in hand (*see* Doc. 71). Similarly, there is no evidence as to when Frakes put his appeals in the mail to the ARB. Notably, Frakes did not sign or date the designated section of either grievance indicating that he was appealing to the ARB (*see* Doc. 71-3, p. 60; Doc. 71-4, p. 1).

Furthermore, there is evidence in the record that gives the Court reason to question whether the grievance process and prison mail system were functioning properly, which Defendants assume. During the Court's review of the evidence, there were a number of obvious irregularities and abnormalities in how the grievance process operated while Warden Loy was in charge. For example, it took an entire week before the June 28th grievance was even presented to the warden to decide whether it was indeed an emergency. The Court knows from its experience in handling hundreds of motions for summary judgment on the issue of exhaustion that this timeframe is atypically long. That delay presumably prompted Mr. Frakes to file a duplicate emergency grievance on July 5th. There is no evidence that Mr. Frakes was ever advised that his June 28th and July 5th grievances were aggregated or that they were being processed on an emergency, expedited basis. In fact, the evidence suggests he was *not* ever told as much given that he inquired sometime around July 15th about the status of his grievance. A counselor then mistakenly told him that the July 5th grievance had been lost, so Frakes resubmitted it *for a third time.* Even though the resubmitted grievance was marked as an emergency, it was never presented to the warden to determine whether an emergency was substantiated. It was instead handled as an entirely new, non-emergency grievance by the counselor, even though it was duplicative of the aggregated grievances already under consideration. Additionally, after the grievance officer issued her recommendation to deny the aggregated grievance, there was a two-week delay before the warden saw it, which the Court again knows from experience is atypical. None of these issues are dispositive as to

whether Frakes exhausted his administrative remedies, but they do leave the Court with the inescapable impression that the grievance process was in some degree of disarray.

The Court also notes the unusual timeline of when the ARB received Frakes's appeals. Warden Loy decided the aggregated grievance first, on August 9, 2023, and the resubmitted grievance second, on August 15th. But the ARB curiously received the appeal of the latter decision first (on September 27th) and then did not receive the appeal of the former decision until over a month later (on November 1st). If Frakes received both of the warden's decisions in a timely manner, then it simply makes no sense that he would mail in his appeal for the second decision but inexplicably wait to appeal the first decision. That leads the Court to question whether there was some kind of delay or hiccup in Frakes receiving the warden's decisions and being able to mail out his appeals. The Court's curiosity is heightened even further by the fact that the ARB did not reject Frakes's appeal of the resubmitted grievance as untimely even though it was not received until 43 days after the warden issued his decision. Based on the Court's experience in deciding issues of exhaustion in prisoner cases, that suggests the ARB knew or had reason to know that its late receipt of the appeal was due to circumstances outside of Frakes's control.

Given the general disarray of the grievance process, the disordered timing of when the ARB received the appeals, and the ARB's acceptance of an arguably untimely appeal, it would be improper for the Court to infer that Frakes promptly received the warden's decisions but simply chose to hold off on mailing his appeals to the ARB and instead opted to file suit prematurely. *See Keeton*, 667 F.3d at 884 (explaining that even when non-

movant "has not provided [their] own version of the facts, we still view all of the facts asserted by [the movant] in the light most favorable to . . . the nonmoving party, and we draw all reasonable inferences in [their] favor."). Rather, the evidence establishes a material question of fact as to whether Mr. Frakes was thwarted from filing a timely appeal to the ARB due to circumstances outside of his control. For example, perhaps Frakes filed suit when he did because he thought that that his grievances had been lost or destroyed, but then later received the warden's decisions and appealed them to the ARB.

In light of all of these questions and holes in the evidence, the Court must conclude that Defendants have failed their burden of demonstrating they are entitled to judgment as a matter of law. Normally, the Court would resolve the issues of fact by holding an evidentiary hearing known as a "*Pavey* hearing." *Smallwood v. Williams*, 59 F.4th 306, 315 (7th Cir. 2023) (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)). *Accord Wagoner v. Lemmon*, 778 F.3d 586, 590 (7th Cir. 2015); *Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014). However, the Court believes that holding a *Pavey* hearing in this instance would be futile because the issues of fact cannot be resolved without Mr. Frakes's side of the story. The Court suspects that Mr. Frakes is the only one who knew the details of his efforts to exhaust, and it is impossible for him to share that information given his untimely death. Consequently, the motion for summary judgment on the issue of exhaustion is denied.

### Conclusion

Defendants Justin Warren and Jordan Heckler's motion for judgment on the pleadings (Doc. 70) is **DENIED**. Their motion for summary judgment on the issue of

Page 23 of 24

exhaustion (Doc. 71) is likewise **DENIED**. The stay on discovery on the merits of Plaintiff's claims (*see* Doc. 69) is **LIFTED**. A status hearing will be set by separate order to discuss a new schedule in this case and the possibility of mediation.

**IT IS SO ORDERED.**

**DATED: May 13, 2026**

_____
**MARK A. BEATTY**
**United States Magistrate Judge**